# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

GO TIN (ZHONGSHAN) HARDWARE MANUFACTURING LIMITED,

Plaintiff,

v.

UNITED STATES OF AMERICA; MARKWAYNE MULLIN, *in his official capacity as Secretary of Homeland Security*; UNITED STATES CUSTOMS AND BORDER PROTECTION; SCOTT BESSENT, *in his official capacity as Secretary of the Treasury*; UNITED STATES DEPARTMENT OF THE TREASURY; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; HOWARD LUTNICK, *in his official capacity as Secretary of Commerce*; UNITED STATES DEPARTMENT OF COMMERCE; RODNEY S. SCOTT, *in his official capacity as Commissioner of United States Customs and Border Protection*; JAMIESON GREER, *in his official capacity as the United States Trade Representative*; and OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE,

Defendants.

Case No.: 1:26-cv-4404

**COMPLAINT**

Plaintiff Go Tin (Zhongshan) Hardware Manufacturing Limited ("Plaintiff") by and through its undersigned counsel, brings this civil action against Defendants and alleges as follows:

## INTRODUCTION

1. Plaintiff commences this action to obtain relief in the form of a refund of certain unauthorized tariffs, *i.e.*, duties, imposed by certain Executive Orders and paid by Plaintiff.

2. Plaintiff imports fastening and door hardware products and did so during the period from February 4, 2025, through February 24, 2026.

3. Beginning in February 2025, pursuant to a series of Executive Orders asserting authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq*., the United States imposed upon importers an obligation to pay additional duties on goods imported from nearly all countries ("IEEPA duties"), including countries from which Plaintiff sources its imports.

4. Consistent with the Executive Orders, corresponding amendments to the Harmonized Tariff Schedule of the United States ("HTSUS"), and guidance from United States Customs and Border Protection ("CBP"), Plaintiff has paid these IEEPA duties to CBP in connection with entries of merchandise for which it is the importer of record.

5. On February 20, 2026, the Supreme Court held that "IEEPA does not authorize the President to impose tariffs." *See Learning Resources, Inc. et al. v. Trump*, 607 U.S. 229, 255 (2026), (affirming *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025)).

6. Accordingly, Plaintiff seeks for itself an order requiring Defendants to refund all IEEPA duties paid by Plaintiff, with interest. To the extent that Plaintiff's entries subject to IEEPA duties have already liquidated or liquidate during the pendency of this action, Plaintiff seeks reliquidation such that Plaintiff receives a refund of all IEEPA duties paid with interest.

## JURISDICTION

7. The Court has subject matter jurisdiction under 28 U.S.C. § 1581 because this action is commenced against an officer of the United States and arises out of an Executive Order providing for tariffs. 28 U.S.C. § 1581(i)(1)(B); *see Solfa Solar, Inc. v. United States*, 296 F. Supp. 3d 1296, 1299 (Ct. Int'l Trade 2018); *V.O.S. Selections, Inc.*, 149 F.4th at 1328-30.

8. The Court possesses all the powers in law and equity of, or as conferred by statute upon, a district court of the United States. 28 U.S.C. § 1585. The Court may enter a money judgment for or against the United States in any civil action commenced under 28 U.S.C. § 1581 or 28 U.S.C. § 1582 and may also order any other form of relief that is appropriate in a civil action. 28 U.S.C. §§ 2643(a)(1), (c)(1).

## PARTIES

9. Plaintiff imports machine screws and hinges for interior and exterior doors, as well as other related fastening and door hardware components.

10. Plaintiff imports products from jurisdictions subject to IEEPA tariffs and did so during the period the IEEPA duties were in effect and being collected.

11. Defendant the United States of America is the federal government of the United States of America.

12. Defendant Markwayne Mullin, in his official capacity, is the Secretary of Homeland Security. The Secretary of Homeland Security was responsible for implementing (i) Executive Order No. 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (April 2, 2025) (as amended, the "Reciprocal Tariff Order"); (ii) Executive Order No. 14195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 1, 2025) (as amended, the "China Fentanyl Tariff Order"); (iii) Executive Order No. 14193, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9113 (Feb. 1, 2025) (as amended, the "Canada Tariff Order"); (iv) Executive Order No. 14194, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9117 (Feb. 1, 2025) (as amended, the "Mexico Tariff Order"); (v) Executive Order No. 14323, *Addressing Threats to the United States by the Government of Brazil*,

90 Fed. Reg. 37,739 (July 30, 2025) (as amended, the "Brazil Tariff Order"), and (vi) Executive Order No. 14329, *Addressing Threats to the United States by the Government of the Russian Federation,* 90 Fed. Reg. 38,701 (August 6, 2025) (as amended, the "India Tariff Order," and, together with the Reciprocal Tariff Order, the China Fentanyl Tariff Order, the Canada Tariff Order, Mexico Tariff Order, and the Brazil Tariff Order, the "Challenged Orders"), which all relied on IEEPA to impose tariffs on United States trading partners around the world. The Secretary of Homeland Security was also responsible, through the Department of Homeland Security's component, United States Customs and Border Protection, for administering and collecting tariffs that were directed by the Challenged Orders.

13. Defendant United States Customs and Border Protection was responsible for administering and collecting tariffs directed by the Challenged Orders.

14. Defendant Scott Bessent, in his official capacity, is the Secretary of the Treasury. He was responsible for consulting on implementation of tariffs directed by the Challenged Orders.

15. Defendant United States Department of the Treasury was responsible for consulting on implementation of tariffs directed by the Challenged Orders.

16. Defendant United States Department of Homeland Security was responsible for implementing the Challenged Orders. It was also responsible, through its component, United States Customs and Border Protection, for administering and collecting tariffs directed by all the Challenged Orders.

17. Defendant Howard Lutnick, in his official capacity, is the Secretary of Commerce. He was responsible for implementing tariffs directed by the Challenged Orders.

18. Defendant United States Department of Commerce was responsible for implementing tariffs directed by the Challenged Orders.

19. Defendant Rodney S. Scott, in his official capacity, is the Commissioner of United States Customs and Border Protection. He was responsible for administering and collecting tariffs directed by the Challenged Orders.

20. Defendant Jamieson Greer, in his official capacity, is the United States Trade Representative. He was responsible for implementing tariffs directed by the Challenged Orders.

21. Defendant the Office of the United States Trade Representative ("USTR") was responsible for implementing tariffs directed by the Challenged Orders.

## STANDING

22. To establish Article III standing, a plaintiff must show injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). Plaintiff is harmed by the Challenged Orders because Plaintiff has imported goods subject to tariffs imposed by the Challenged Orders and, therefore, has paid these tariffs to the United States government. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."); *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 599 (2007) ("being forced to pay" money to the government "causes a real and immediate economic injury"). An order from this Court requiring refund of the IEEPA duties paid will redress these injuries by reversing the unlawful costs incurred by Plaintiff.

## BACKGROUND & FACTUAL ALLEGATIONS

### A. The Canada Tariff Order

23. On February 1, 2025, the President issued the Canada Tariff Order (previously defined as Executive Order No. 14193, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9113 (Feb. 1, 2025), as amended). The Canada Tariff Order

imposed an additional 25 percent *ad valorem* tariff on products from Canada on top of any existing duties, subject to certain exceptions.

24. The Canada Tariff Order declared a national emergency based on the use of fentanyl and other illicit drugs and the "the failure of Canada to do more to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and drugs." *Id*. at 9114.

25. The asserted authority for imposing tariffs under the Canada Tariff Order was IEEPA.

26. On February 3, 2025, the President issued Executive Order No. 14197, *Progress on the Situation at Our Northern Border*, 90 Fed. Reg. 9183 (Feb. 3, 2025), which suspended the imposition of the additional tariffs through March 4, 2025.

27. On March 2, 2025, the President issued Executive Order No. 14226, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,369 (March 2, 2025), which reinstated *de minimis* treatment with respect to imports from Canada and suspended the imposition of the additional tariffs through March 7, 2025.

28. On March 6, 2025, the President issued Executive Order No. 14231, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,785 (March 6, 2025), which eliminated the additional tariffs for product imported duty-free as a product of Canada under the United States-Mexico-Canada Agreement ("USMCA") and lowered the applicable tariff rate on potash to 10 percent.

29. On April 14, 2025, multiple companies filed an action in this Court challenging the President's authority to issue various tariff-related Executive Orders (including the Canada Tariff Order) under IEEPA and the Constitution. *See V.O.S. Selections, et al. v. Trump*, *et al*., No. 25-

066 (Ct. Int'l Trade 2025). This Court determined that the Executive Orders were unlawful. *See V.O.S. Selections v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025).

30. On July 31, 2025, the President issued Executive Order No. 14325, *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 37,957 (July 31, 2025), which raised the additional *ad valorem* tariff on products imported from Canada to 35 percent, again subject to limited exceptions previously in place, effective August 1, 2025.

31. On August 29, 2025, the Federal Circuit affirmed this Court's holding in *V.O.S. Selections* that the Executive Orders were unlawful. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025).

32. On February 20, 2026, the Supreme Court affirmed the Federal Circuit's decision and held that IEEPA does not authorize the President to impose tariffs. *See Learning Resources, Inc. et al. v. Trump*, 607 U.S. 229, 255 (2026).

33. Following that decision, the President issued Executive Order No. 14389, *Ending Certain Tariff Actions*, 91 Fed. Reg. 9437 (Feb. 20, 2026), declaring that the *ad valorem* duties imposed by way of the Canada Tariff Order "shall no longer be in effect and, as soon as practicable, shall no longer be collected."

34. On February 22, 2026, CBP issued a message through the Cargo Systems Messaging Service ("CSMS") informing importers that the "duties imposed pursuant to IEEPA," including those under the Canada Tariff Order, "will no longer be in effect and will no longer be collected for goods entered for consumption or withdrawn from warehouse for consumption, on or after 12:00 a.m. eastern time on February 24, 2026[.]"

**B. The Mexico Tariff Order**

35. On February 1, 2025, the President issued the Mexico Tariff Order (previously defined as Executive Order No. 14194, *Imposing Duties to Address the Situation at Our Southern*

*Border*, 90 Fed. Reg. 9117 (Feb. 1, 2025), as amended). The Mexico Tariff Order imposed an additional 25 percent *ad valorem* tariff on products from Mexico on top of any existing duties.

36. The Mexico Tariff Order declared a national emergency based on the "influx of illegal aliens and illicit drugs into the United States" and the "the failure of Mexico to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and drugs." *Id*.

37. The asserted authority for imposing tariffs under the Mexico Tariff Order was IEEPA.

38. On March 2, 2025, the President issued Executive Order No. 14227, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Southern Border*, 90 Fed. Reg. 11,369 (March 2, 2025), which reinstated *de minimis* treatment with respect to imports from Mexico.

39. On March 6, 2025, the President issued Executive Order No. 14232, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Southern Border*, 90 Fed. Reg. 11,787 (March 6, 2025), which eliminated the additional tariffs for product imported duty-free as a product of Mexico under the USMCA and lowered the applicable tariff rate on potash to 10 percent.

40. On April 14, 2025, multiple companies filed an action in this Court challenging the President's authority to issue various tariff-related Executive Orders (including the Mexico Tariff Order) under IEEPA and the Constitution. *See V.O.S. Selections, Inc. v. Trump*, No. 25-066 (Ct. Int'l Trade 2025). This Court determined that the Executive Orders were unlawful. *See V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025).

41. On August 29, 2025, the Federal Circuit affirmed this Court's holding in *V.O.S. Selections* that the Executive Orders were unlawful. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025).

42. On February 20, 2026, the Supreme Court affirmed the Federal Circuit's decision and held that IEEPA does not authorize the President to impose tariffs. *See Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026).

43. Following that decision, the President issued Executive Order No. 14389, *Ending Certain Tariff Actions*, 91 Fed. Reg. 9437 (Feb. 20, 2026), declaring that the *ad valorem* duties imposed by way of the Mexico Tariff Order "shall no longer be in effect and, as soon as practicable, shall no longer be collected."

44. On February 22, 2026, CBP issued guidance through the CSMS informing importers that the "duties imposed pursuant to IEEPA," including those under the Mexico Tariff Order, "will no longer be in effect and will no longer be collected for goods entered for consumption or withdrawn from warehouse for consumption, on or after 12:00 a.m. eastern time on February 24, 2026[.]"

**C. The China Fentanyl Tariff Order**

45. On February 1, 2025, the President issued the China Fentanyl Tariff Order (previously defined as Executive Order No. 14195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 1, 2025), as amended). The China Fentanyl Tariff Order imposed an additional 10 percent *ad valorem* tariff on products imported from China on top of any existing duties.

46. The China Fentanyl Tariff Order declared a national emergency based on the "sustained influx of synthetic opioids" in the United States and "the failure of [the Chinese]

government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." *Id*. at 9122.

47. The asserted authority for imposing tariffs under the China Fentanyl Tariff Order was IEEPA.

48. On March 3, 2025, the President issued Executive Order No. 14228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (March 3, 2025), which increased the additional tariffs on imports from China to 20 percent.

49. On April 14, 2025, multiple companies filed an action in this Court challenging the President's authority to issue various tariff-related Executive Orders (including the China Fentanyl Tariff Order) under IEEPA and the Constitution. *See V.O.S. Selections, et al. v. Trump*, *et al*., No. 25-066 (Ct. Int'l Trade 2025). This Court determined that the Executive Orders were unlawful. *See V.O.S. Selections v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025).

50. On August 29, 2025, the Federal Circuit affirmed this Court's holding in *V.O.S. Selections* that the Executive Orders were unlawful. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025).

51. On November 4, 2025, the President issued Executive Order No. 14357, *Modifying Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 50,725 (Nov. 4, 2025), which decreased the additional tariff on imports from China back to the original 10 percent rate set by Executive Order No. 14195.

52. On February 20, 2026, the Supreme Court affirmed the Federal Circuit's decision and held that IEEPA does not authorize the President to impose tariffs. *See Learning Resources, Inc. et al. v. Trump*, 607 U.S. 229, 255 (2026).

53. Following that decision, the President issued Executive Order No. 14389, *Ending Certain Tariff Actions*, 91 Fed. Reg. 9437 (Feb. 20, 2026), declaring that the *ad valorem* duties imposed by way of the China Fentanyl Tariff Order "shall no longer be in effect and, as soon as practicable, shall no longer be collected."

54. On February 22, 2026, CBP issued a message through the CSMS informing importers that the "duties imposed pursuant to IEEPA," including those under the China Fentanyl Tariff Order, "will no longer be in effect and will no longer be collected for goods entered for consumption or withdrawn from warehouse for consumption, on or after 12:00 a.m. eastern time on February 24, 2026[.]"

**D. The Reciprocal Tariff Order**

55. On April 2, 2025, the President issued an Executive Order imposing tariffs on goods originating from virtually all countries. *See* the Reciprocal Tariff Order (previously defined as Executive Order No. 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (April 2, 2025), as amended). The express stated goal of these tariffs was "to rebalance global trade flows." *Id*. at 15,045.

56. The Reciprocal Tariff Order declared that the "large and persistent annual U.S. goods trade deficits" are a "national emergency" because they "constitute an unusual and extraordinary threat to the national security and economy of the United States." *Id*. at 15,041.

57. The Reciprocal Tariff Order found that these trade deficits have "led to the hollowing out of our manufacturing base; inhibited our ability to scale advanced domestic manufacturing capacity; undermined critical supply chains; and rendered our defense-industrial base dependent on foreign adversaries." *Id*. at 15,041.

58. Based on this newly declared national emergency, the Reciprocal Tariff Order specifically imposed "an additional *ad valorem* duty" of 10 percent "on all imports from all trading partners" effective April 5, 2025, except for countries and products as expressly excluded. *Id*. at 15,045. The Order also imposed a country-specific tariff rate on 57 trading partners, including Brazil, China, India, Taiwan, Thailand, and Vietnam, set to take effect on April 9, 2025. *Id*. at 15,045, 15,049-50. Taken together, these tariffs are referred to as the "Reciprocal Tariffs." The Reciprocal Tariff Order modified the HTSUS accordingly. *Id*. at 15,047.

59. The asserted authority for imposing tariffs under the Reciprocal Tariff Order was IEEPA.

60. On April 8, 2025, the President issued Executive Order No. 14259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China*, 90 Fed. Reg. 15,509 (April 8, 2025), raising the Reciprocal Tariff rate on imports from China to 84 percent.

61. On April 9, 2025, the President issued Executive Order No. 14266 suspending imposition of the country-specific rates, with the exception of China, until July 9, 2025. Executive Order No. 14266, *Modifying Reciprocal Tariff Rates To Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625, at 15,626 (April 9, 2025). That order did not suspend the 10 percent universal tariffs, meaning that the 10 percent rate applied during that period to goods originating in all of the trading partners covered by the Reciprocal Tariffs. *Id*.

62. On April 11, 2025, the President clarified that a variety of technological products related to computers, data processing, telecommunications, and electronic components were exempted from the Reciprocal Tariffs.[1]

---

[1] *See* Presidential Memorandum, *Clarification of Exceptions Under Executive Order 14257 of April 2, 2025, as Amended* (April 11, 2025).

63. On April 14, 2025, multiple companies filed an action in this Court challenging the President's authority to issue various tariff-related Executive Orders (including the Reciprocal Tariff Order) under IEEPA and the Constitution. *See V.O.S. Selections, et al. v. Trump*, *et al*., No. 25-066 (Ct. Int'l Trade 2025). This Court determined that the Executive Orders were unlawful. *See V.O.S. Selections v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025).

64. On May 12, 2025, the President issued Executive Order No. 14298 further modifying the Reciprocal Tariff rate applicable to China—from 125 percent to 34 percent—and temporarily suspending 24 percentage points of the Reciprocal Tariffs on imports from China for 90 days—leaving an effective Reciprocal Tariff rate of 10 percent during that period. Executive Order No. 14298, *Modifying Reciprocal Tariff Rates to Reflect Discussions With the People's Republic of China*, 90 Fed. Reg. 21,831 (May 12, 2025).

65. On July 7, 2025, the President issued Executive Order No. 14316 extending the suspension of the country-specific rates until August 1, 2025. Executive Order No. 14316, *Extending the Modification of the Reciprocal Tariff Rates*, 90 Fed. Reg. 30,823, at 30,823 (July 7, 2025).

66. On July 31, 2025, the President issued Executive Order No. 14326, which adjusted the country-specific rates, with the exception of China, and further extended their application until seven days after the order. Executive Order No. 14326, *Further Modifying the Reciprocal Tariff Rates*, 90 Fed. Reg. 37,963, at 37,963-64 (July 7, 2025).

67. On August 11, 2025, the President issued Executive Order No. 14334 extending the Reciprocal Tariff treatment of China-origin goods until November 10, 2025. Executive Order No. 14334, *Further Modifying Reciprocal Tariff Rates to Reflect Ongoing Discussions With the People's Republic of China*, 90 Fed. Reg. 39,305 (August 11, 2025).

68. On August 29, 2025, the Federal Circuit affirmed this Court's holding in *V.O.S. Selections* that the Executive Orders were unlawful. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025).

69. On November 4, 2025, the President issued Executive Order No. 14358 further extending the Reciprocal Tariff treatment of China-origin goods until November 10, 2026. Executive Order No. 14358, *Modifying Reciprocal Tariff Rates Consistent With the Economic and Trade Arrangement Between the United States and the People's Republic of China*, 90 Fed. Reg. 50,729 (Nov. 4, 2025).

70. On February 20, 2026, the Supreme Court affirmed the Federal Circuit's decision and held that IEEPA does not authorize the President to impose tariffs. *See Learning Resources, Inc. et al. v. Trump*, 607 U.S. 229, 255 (2026).

71. Following that decision, the President issued Executive Order No. 14389, *Ending Certain Tariff Actions*, 91 Fed. Reg. 9437 (Feb. 20, 2026), declaring that the *ad valorem* duties imposed by way of the Reciprocal Tariff Order "shall no longer be in effect and, as soon as practicable, shall no longer be collected."

72. On February 22, 2026, CBP issued guidance through the CSMS informing importers that the "duties imposed pursuant to IEEPA," including those under the Reciprocal Tariff Order, "will no longer be in effect and will no longer be collected for goods entered for consumption or withdrawn from warehouse for consumption, on or after 12:00 a.m. eastern time on February 24, 2026[.]"

**E. The Brazil Tariff Order**

73. On July 30, 2025, the President issued the Brazil Tariff Order (previously defined as Executive Order No. 14323, *Addressing Threats to the United States by the Government of Brazil*, 90 Fed. Reg. 37,739 (July 30, 2025), as amended). The Brazil Tariff Order imposed an

additional 40 percent *ad valorem* tariff on certain products from Brazil on top of any existing duties.

74. The Brazil Tariff Order relied on the President's declaration of a national emergency with respect to actions taken by the Brazilian government which the President asserted "are a threat to the economy of the United States, conflict with and threaten the policy of the United States to promote free speech and free and fair elections at home and abroad, and violate fundamental human rights." *Id*. at 37,739.

75. The asserted authority for imposing tariffs under the Brazil Tariff Order was IEEPA.

76. On February 20, 2026, the Supreme Court held that IEEPA does not authorize the President to impose tariffs. *See Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026).

77. While IEEPA duties paid pursuant to the Brazil Tariff Order were not directly before the Supreme Court in *V.O.S. Selections* and *Learning Resources*, the Supreme Court's finding that IEEPA does not grant the President the authority to impose tariffs applies with equal force to all of the Challenged Orders, including the Brazil Tariff Order, notwithstanding the differing asserted national emergencies. Thus, in Executive Order No. 14389, *Ending Certain Tariff Actions*, 91 Fed. Reg. 9437 (Feb. 20, 2026), as with other IEEPA duties, the President declared that the *ad valorem* duties imposed by way of the Brazil Tariff Order "shall no longer be in effect and, as soon as practicable, shall no longer be collected."

78. On February 22, 2026, CBP issued a message through the CSMS informing importers that the "duties imposed pursuant to IEEPA," including those under the Brazil Tariff Order, "will no longer be in effect and will no longer be collected for goods entered for

consumption or withdrawn from warehouse for consumption, on or after 12:00 a.m. eastern time on February 24, 2026[.]"

**F. The India Tariff Order**

79. On August 6, 2025, the President issued the India Tariff Order (previously defined as Executive Order No. 14329, *Addressing Threats to the United States by the Government of the Russian Federation,* 90 Fed. Reg. 38,701 (August 6, 2025), as amended). The India Tariff Order imposed an additional 25 percent on products from India on top of any existing duties.

80. The India Tariff Order relied on the President's declaration of a national emergency with respect to actions taken by the Russian government against Ukraine and imposed the additional tariffs on India on the grounds that India was "directly or indirectly importing Russian Federation Oil." *Id*. at 38,701.

81. The asserted authority for imposing tariffs under the India Tariff Order was IEEPA.

82. On February 6, 2026, the President issued Executive Order No. 14384, *Modifying Duties to Address Threats to the United States by the Government of the Russian Federation*, 91 Fed. Reg. 6501 (Feb. 11, 2026), removing the additional 25 percent tariff on India-origin goods.

83. On February 20, 2026, the Supreme Court held that IEEPA does not authorize the President to impose tariffs. *See Learning Resources, Inc. et al. v. Trump*, 607 U.S. 229, 255 (2026).

84. While IEEPA tariffs paid pursuant to the India Tariff Order were not directly before the Supreme Court in *V.O.S. Selections* and *Learning Resources*, the Supreme Court's finding that IEEPA does not grant the President the authority to impose tariffs applies with equal force to all of the Challenged Orders, including the India Tariff Order, notwithstanding the differing asserted national emergencies. Thus, in Executive Order No. 14389, *Ending Certain Tariff Actions*, 91 Fed. Reg. 9437 (Feb. 20, 2026), as with other IEEPA duties, the President declared that the *ad valorem*

duties imposed by way of the India Tariff Order "shall no longer be in effect and, as soon as practicable, shall no longer be collected."

85. On February 22, 2026, CBP issued guidance through the CSMS informing importers that the "duties imposed pursuant to IEEPA," including those under the India Tariff Order, "will no longer be in effect and will no longer be collected for goods entered for consumption or withdrawn from warehouse for consumption, on or after 12:00 a.m. eastern time on February 24, 2026[.]"

### G. CBP's Implementation of the Challenged Orders

86. CBP is responsible for administering and collecting duties imposed under United States law, including the IEEPA duties at issue. *See* 19 U.S.C. §§ 1500, 1502.

87. In 1988, Congress enacted the Omnibus Trade and Competitiveness Act of 1988, which adopted a new tariff nomenclature, the HTSUS. CBP classifies merchandise imported into the United States consistent with the HTSUS, which sets out the tariff rates and statistical categories using a series of nested chapters, headings, and subheadings. *See* 19 U.S.C. § 1202. The primary headings of the HTSUS describe broad categories of merchandise, and its subheadings provide particularized divisions of goods within each category. *Id.*

88. The United States International Trade Commission ("USITC") publishes and maintains the HTSUS consistent with presidential orders. 19 U.S.C. §§ 1202, 3005, 3006; *see also Michael Simon Design, Inc. v. United States*, 33 Ct. Int'l Trade 1003, 1010 (2009) ("The authority to modify the HTSUS lies with the President").

89. When goods enter the United States, CBP is responsible for assessing and collecting duties according to the rates established by the HTSUS. *See* 19 U.S.C. §§ 1202, 1500, 1502.

90. CBP's regulations govern the classification and appraisement of merchandise, consistent with the HTSUS. 19 C.F.R. § 152.11.

91. In implementing the Challenged Orders, CBP required that goods subject to the IEEPA duties be classified under newly created HTSUS classifications in Chapter 99 of the HTSUS, which includes various provisions established based on "temporary legislation" and "temporary modifications established pursuant to trade legislation," among other provisions. HTSUS, USITC Pub. No. 5684 at Chapter 99 (Nov. 2025). These new classifications in Chapter 99 of the HTSUS exist solely because of the tariffs imposed by the Challenged Orders, which the Supreme Court has declared unlawful.

**H. Liquidation of Entries Subject to IEEPA Tariffs**

92. "Liquidation" means "the final computation or ascertainment of duties on entries for consumption or drawback entries." 19 C.F.R. § 159.1.

93. Typically, when goods enter the United States (i.e., when they are imported), the importer of record pays estimated duties, taxes, and fees on the entry based on its customs declarations, including value, origin and HTSUS classification of the imported goods. *See* 19 U.S.C. § 1484. CBP then reviews the customs declaration and may inspect the goods.

94. CBP then fixes the final appraisement of merchandise by confirming the final value, classification, duty rate, and final amount of duty for the imported goods. *See* 19 U.S.C. § 1500.

95. Once the final amount of tariffs and/or duties is determined, CBP "liquidates" the entry and ordinarily notifies the importer of record as to whether it owes more money or is entitled to a refund. *See* U.S.C. § 1504(b). CBP typically liquidates entries 314 days after the date of entry of the goods.

96. Some of Plaintiff's entries subject to the unlawful IEEPA duties have already liquidated or may liquidate during the pendency of this proceeding.

97. This Court's authority to order reliquidation of liquidated entries is settled with respect to all IEEPA duties, regardless of the underlying Challenged Order. As the government

has acknowledged, it "will not object to the [c]ourt ordering reliquidation of plaintiffs' entries subject to the challenged IEEPA duties if such duties are found to be unlawful . . . ." *AGS Company Automotive Solutions v. U.S. Customs and Border Protection*, 2025 WL 3634261, at *2 (Ct. Int'l Trade, Dec. 15, 2025); *see also AGS*, No. 1:25-cv-00255, Slip Op. 25-154, at 6 (Ct. Int'l Trade Dec. 15, 2025) (recognizing the Court of International Trade has the "explicit power to order reliquidation and refunds where the government has unlawfully exacted duties") (quoting *In re Sec. 301 Cases*, 524 F. Supp. 3d 1355, 1365-66 (Ct. Int'l Trade 2021)).

98. And as this Court noted, the "Government's stipulation regarding reliquidation applies to all current and future similarly situated plaintiffs" and includes "challenges to IEEPA tariffs imposed on Brazil and India that are not at issue in *AGS* or *V.O.S.*" *AGS*, No. 1:25-cv-00255, ECF No. 35, Paperless Order (Ct. Int'l Trade, Jan. 14, 2026).

99. The government has taken the position that this Court can order reliquidation of finally liquidated entries, including entries that have been liquidated for more than 90 days, with respect to plaintiffs challenging the IEEPA tariffs before this Court. *See V.O.S. Selections, Inc. v. Trump*, Opening Brief for Appellants, No. 26-1895, Dkt. 19 (Fed. Cir., Aug. 10, 2026) at 35 ("And as to finally liquidated entries, the government has made clear, as noted above, that it did 'not dispute the [CIT]'s authority to order reliquidation' to remove IEEPA tariffs.") (citing Stipulation Regarding the Court's Authority to Order Reliquidation at 1, *Atmus* (Mar. 3, 2026), Dkt. 16).

100. Accordingly, to the extent entries have liquidated prior to or during the pendency of this action, Plaintiff requests that this Court order reliquidation of all entries subject to IEEPA duties imposed by way of the Challenged Orders and a refund, with interest, of such duties.[2]

[2]The Challenged Orders also required that, except for articles eligible for admission under domestic status, articles subject to the IEEPA tariffs imposed by the Challenged Orders must be admitted into a Foreign-Trade Zone ("FTZ") as privileged foreign status. *See* Reciprocal Tariff Order, § 3(g); China Fentanyl Tariff Order, § 2(e); Canada Tariff Order, § 2(f), § 3(d); Mexico Tariff Order, § 2(e); Brazil Tariff Order, § 3(d); India Tariff Order, § 3(e). For articles

## I. The Supreme Court Held that IEEPA Does Not Authorize the President to Impose the IEEPA Duties

101. On April 14, 2025, multiple companies filed an action in this Court challenging the President's authority to issue various tariff-related Executive Orders (including the Reciprocal Tariff Order and the China Fentanyl Tariff Order) under IEEPA and the Constitution. *See V.O.S. Selections, et al. v. Trump*, *et al*., No. 25-066 (Ct. Int'l Trade 2025). This Court held that the Challenged Orders were unlawful, and the Federal Circuit and Supreme Court affirmed. *See Learning Resources, Inc. et al. v. Trump*, 607 U.S. 229, 255 (2026), Slip. Op. at 20 (affirming *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025)).

102. The Supreme Court found that, contrary to the justification relied upon by the government, IEEPA's language giving the President the power to "regulate . . . importation" did not authorize the President to impose tariffs. *Id*. at 7.

103. While IEEPA tariffs paid pursuant to the Brazil Tariff Order and the India Tariff Order were not directly before the Supreme Court in *V.O.S. Selections* and *Learning Resources*, the Supreme Court's finding that IEEPA does not grant the President the authority to impose tariffs applies with equal force to all of the Challenged Orders, including the Brazil Tariff Order and the India Tariff Order, notwithstanding the differing asserted national emergencies.

104. On February 20, 2026, the President issued Executive Order No. 14389, *Ending Certain Tariff Actions*, 91 Fed. Reg. 9437 (Feb. 20, 2026), declaring that the *ad valorem* duties imposed by the Challenged Orders "shall no longer be in effect and, as soon as practicable, shall no longer be collected."

---

admitted under privileged foreign status, any United States duties paid is at the rate applicable to the merchandise in its condition at the time of admission – regardless of whether the merchandise was transformed under FTZ procedures into a different product. Plaintiff's request for a refund of IEEPA tariffs includes any IEEPA tariffs paid on articles admitted into an FTZ when the IEEPA tariffs were in effect, and later removed from the FTZ, including during the pendency of this action.

105. On February 22, 2026, CBP issued guidance through the CSMS informing importers that the "duties imposed pursuant to IEEPA," including those under the Challenged Orders, "will no longer be in effect and will no longer be collected for goods entered for consumption or withdrawn from warehouse for consumption, on or after 12:00 a.m. eastern time on February 24, 2026[.]"

**J. Plaintiff Paid IEEPA Duties on Imported Goods**

106. Since the implementation of the Challenged Orders, Plaintiff imported goods from various countries, including entries subject to IEEPA duties pursuant to the Challenged Orders listed in paragraph 12, *supra*.

107. Plaintiff's imports were subject to the IEEPA duties imposed by the Challenged Orders.

108. Plaintiff has paid IEEPA duties on these imports pursuant to the Challenged Orders in excess of what it would have paid absent the tariffs imposed by the Challenged Orders.

109. These tariffs have caused Plaintiff's business to suffer, as it has faced additional and unexpected costs.

110. Plaintiff's entries for which it paid IEEPA duties imposed by the Challenged Orders have liquidated or will liquidate in the near future.

## CLAIMS FOR RELIEF

## COUNT I

### THE CHALLENGED TARIFF ORDERS ARE UNLAWFUL FOR THE REASONS STATED BY THE SUPREME COURT IN *LEARNING RESOURCES*

111. Plaintiff realleges and incorporates herein by reference the foregoing Paragraphs of the Complaint as if fully set forth herein.

112. In *Learning Resources,* the Supreme Court considered challenges to the President's authority to impose tariffs under IEEPA and this Court's ruling and the Federal Circuit's affirmance of this Court's opinion in *V.O.S. Selections, Inc. v. Donald J. Trump,* 772 F.Supp. 3d. 1350, 1383 (Ct. Int'l Trade 2025), *aff'd*, 149 F.4th 1312 (Fed. Cir. 2025), holding that the President exceeded his authority under IEEPA, 50 U.S.C. § 1701 *et seq.*, when he imposed tariffs on imported goods.

113. As such, the Challenged Orders are unlawful because IEEPA does not authorize the President to impose tariffs, as determined by the Supreme Court in *Learning Resources*.

114. Plaintiff is entitled to an order directing Defendants to refund all IEEPA duties paid, plus interest, on all relevant entries whether liquidated or unliquidated.

**PRAYER FOR RELIEF**

WHEREFORE, Go Tin (Zhongshan) Hardware Manufacturing Limited respectfully requests that this Court enter an order and judgment:

a. finding that IEEPA grants the President no authority to impose tariffs;

b. finding that the Challenged Orders are unlawful;

c. ordering CBP to reliquidate any of Plaintiff's liquidated entries for which Plaintiff paid IEEPA duties;

d. ordering CBP to liquidate all unliquidated entries subject to IEEPA duties without IEEPA duties;

e. awarding Plaintiff, and ordering Defendants to promptly provide, a refund of the amount of any tariffs imposed under IEEPA, including by way of the Challenged Orders, collected by Defendants, including pre- and post-judgment interest, on all relevant entries whether liquidated or unliquidated, or in the alternative, ordering the United States to pay Plaintiff a money judgment equal to the value of such IEEPA duties, plus pre- and post-judgment interest; and

f. granting any such other relief as this Court may deem just or proper.

*Signature page follows*.

Respectfully submitted,

Dated: October 7, 2026

By: */s/ Brian S. Janovitz*

**DLA PIPER LLP (US)**

Brian S. Janovitz
Elyssa Kutner
Marie Bussey-Garza
Caleb Roche
500 Eighth Street, NW
Washington, DC 20004
(202) 799-4816
brian.janovitz@us.dlapiper.com
elyssa.kutner@us.dlapiper.com
marie.bussey-garza@us.dlapiper.com
caleb.roche@us.dlapiper.com

*Attorneys for Plaintiff*